

**FILED**

Jul 30 2015, 6:42 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Paula M. Sauer
Danville, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Ellen H. Meilaender
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Gabriel Kowalskey, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | July 30, 2015 <br><br> Court of Appeals Case No. <br> 32A01-1503-CR-99 <br><br> Appeal from the Hendricks Superior Court <br><br> The Honorable Rhett M. Stuard, Judge <br><br> Cause No. 32D02-1406-FB-39 <br> Cause No. 32D02-1409-F6-142 |

**Brown, Judge.**

[1] Gabriel Kowalskey brings this interlocutory appeal from the decision of the trial court that he, by his conduct, waived his right to counsel. Kowalskey raises two issues which we revise and restate as whether the court erred in finding that, by his conduct, he waived or forfeited his right to counsel. We reverse and remand.

### Facts and Procedural History

[2] On June 9, 2014, the State charged Kowalskey with possession of cocaine and possession of marijuana as class B felonies under cause number 32D02-1406-FB-39 ("Cause No. 39"), and on that day Herb Witham was appointed as Kowalskey's pauper counsel. The State later amended the information under Cause No. 39 to add counts charging Kowalskey with carrying a handgun without a license as a class A misdemeanor, carrying a handgun without a license as a class C felony, and unlawful possession of a firearm by a serious violent felon as a class B felony. On July 23, 2014, Witham filed a motion to withdraw appearance and appoint alternate counsel "due to a conflict in regard to his continued representation of the defendant." Appellant's Appendix at 39. The same day, the court granted Witham's motion and appointed Tyler Starkey as counsel for Kowalskey.

[3] On September 2, 2014, the State charged Kowalskey with battery of a public safety official as a level 6 felony under cause number 32D-1409-F6-142 ("Cause No. 142"), and the court appointed Starkey as pauper counsel for him.

[4] On December 2, 2014, Starkey filed a motion to withdraw appearance in Cause No. 39 and Cause No. 142 "for the reason that there has been a breakdown in the attorney-client relationship." *Id.* at 77, 123. On the following day, the court granted Starkey's motion and, in its order stated "Def. given 10 days to obtain counsel." *Id.* at 78, 124.

[5] On December 15, 2014, the State filed a motion for attorney status hearing in Cause Nos. 39 and 142 stating that the court had previously appointed two attorneys to represent Kowalskey, both of whom withdrew their appearances, and asking the court to inform Kowalskey of the advisements required by *Gilmore v. State*, 953 N.E.2d 583 (Ind. Ct. App. 2011). The following day, the court issued an order scheduling an attorney status hearing for January 6, 2015, and stating that, at the hearing, Kowalskey would be warned that if his obstreperous behavior persists the court would find that he has chosen self-representation by his own conduct and that he would be warned of the dangers and disadvantages of self-representation.

[6] On January 6, 2015, the court held a hearing on the State's motion. The court asked Kowalskey "do you want to go out for a court-appointed lawyer or . . . where are we on this," and Kowalskey stated "there's some things that I don't understand about the way the process goes here." Transcript at 7. He stated that Witham was his attorney up to his omnibus date and that that was the first time Witham visited him. The court stated that it did not matter and that what mattered was that the case kept moving along and Kowalskey's rights were protected. The following exchange then occurred:

The Court: You have . . . had two attorneys; you couldn't . . . for whatever reason couldn't work with either of those. I mean we could try one more time and appoint you a lawyer and if you want to see if you can work with somebody that's fine; I have no problem with that and we can do that or if you don't think you can work with anybody then – then we can have you waive your right to a lawyer and you can try to represent yourself, you know, we'll have to talk about that but as we sit here right now, uh, I need to know how you want to proceed in this case.

Gabriel Kowalskey: I need a lawyer.

*Id.* at 8.

[7]     After questioning Kowalskey about his finances and finding that he qualified for a court-appointed lawyer, the court appointed Eric Oliver as his counsel in Cause Nos. 39 and 142. The following exchange then occurred:

The Court: . . . . Uh, now, Mr. Kowalskey, uh, that *Gilmer* [sic] case . . . what it tells us is that, uh, if you keep having problems with lawyers over and over and over . . . the Court can enter just on its own that you've decided to represent yourself, okay. I can enter a motion that says by your own conduct, uh, you have decided to represent yourself. Uh, you know . . . and since you've chosen to hire court-appointed – have court-appointed counsel today we're not going to go into that but if we get to that point, you know, they'll have to inform you of, uh, you know, the dangers of self-representation and the risks that are involved in it. The short story is, uh, you would be held to the same standard as this attorney sitting right here who's been to law school, okay.

Gabriel Kowalskey: Yeah.

The Court: And – and so, uh, obviously that's a risk that you – you, you know, you may not want to take. So I'm going to have Mr. Oliver come see you, okay. . . .

* * * * *

Gabriel Kowalskey: . . . [T]here was one more thing that I wanted to - I don't know if it's maybe I should do it but I was speaking to it with

him but when I did have Tyler Starkey, my former attorney, I went to a video court for Battery, the liquid thrown on – water thrown on the staff. I went to video court and then after that I had a visit with Tyler Starkey.

The Court: Okay.

Gabriel Kowalskey: I asked him for a fast and speedy to get this over with since I've done five, six months -

The Court: Okay.

Gabriel Kowalskey: -- in here already; let's get this done with, you know, maybe even sign a plea today but he failed to do that. I wrote him letters after letters and that's where our relationship really -

The Court: Okay.

Gabriel Kowalskey: -- deteriorated because of that subject and, uh, surveillance camera subject which is on the other case but I have the copy right here, the letters that I sent to him asking for a fast and speedy and I haven't been to court one time and it's been over three months since I've been to that video court. And I didn't and just for the record I didn't have any problem with Tyler Starkey. You know, I thought he was working real well for me until the very end, the last two months where he refused to - or failed to contact me. I wrote him over seven letters with the same, you know, literature inside.

* * * * *

The Court: Okay, let's show for the record that [Kowalskey] requests a fast and speedy on [Cause No. 142]. . . .

Gabriel Kowalskey: Thank you.

*Id.* at 9-10, 12-13.

[8] On February 4, 2015, the court held a pretrial conference, at which Kowalskey appeared with Oliver. On February 5, 2015, the court received a letter from Kowalskey in Cause No. 39. In the letter, Kowalskey stated his concerns about "the prosecution, all three of [his] current and former lawyers, and the three arresting officers' inability to produce dash-cam footage or CVS's surveillance

footage from the night of the incident . . . ." Appellant's Appendix at 91. He stated "I know for a fact that all three officers had their emergency lights activated," that "I also know for a fact that CVS has an archive surveillance system," that "the officers deny ever having activated their lights, as if they never even pulled up on me and made a stop," and that "[t]herefore, I began to pursue the CVS's surveillance cameras to prove that they did, in fact, make an investigatory stop." *Id.* He further stated that "after 8 months and three different lawyers I get advised by Eric Oliver at a court hearing on 2-4-15 that the prosecution does not have the CVS footage," that "[w]hen asked why, Mr. Oliver claimed that [it] had been deleted by CVS," that "I then asked Mr. Oliver how he obtained the message that the footage had been deleted to which he admitted that he made up that statement," that "[h]e then admitted that the only information the prosecution offered was that they did not have CVS's footage in their possession," and that, "[l]astly, he admitted that he never put forth effort in contacting CVS for the footage personally." *Id.* at 91-92. Kowalskey stated, "I am scheduled for a suppression hearing and without footage from the scene or an honest account from at least one of the officers I cannot 'definitely' prove the arresting officer made an Invalid Investigatory Stop – they claim a stop was never made." *Id.* at 92. Kowalskey also said "I'm not asking to fire [] Oliver. That is by no means not my intentions of this letter" and that "[a]ll that I'm hoping with this letter is that you, Your Honor, . . . demand that the prosecution produce or pursue obtaining either one of the three officer's dash-cam or footage from CVS . . . ." *Id.* The court's chronological

case summary for Cause No. 39 contains an entry indicating that the clerk was to provide a copy of the letter to the State and Oliver.

[9] On February 6, 2015, Oliver filed a motion to withdraw appearance in Cause No. 39 and Cause No. 142 stating that he "received a letter on or about February 5, 2015 from Mr. Kowalskey containing information that prohibits [him] from representing [Kowalskey] further." *Id.* at 93, 130.

[10] On February 9, 2015, the court held a hearing under both causes at which Kowalskey appeared with Oliver. The following exchange occurred:

> The Court: [T]he Court got one letter from you which I forwarded on to the State and Mr. Oliver indicating that you felt like he was lying to you and, uh, quite possibly violating your due process rights. Uh, Mr. Kowalskey, we were here in Court back in January; do you remember that?
>
> Gabriel Kowalskey: Yes, I absolutely do.
>
> The Court: And, uh, that was on January 6, 2015 and you and I had a discussion sitting right here about the fact that if I was going to appoint you another attorney and that if you couldn't get along with that attorney and did something to cause him to withdraw that you're going to proceed on your own; do you remember that?
>
> Gabriel Kowalskey: Yeah, I remember.
>
> The Court: And now it appears to me that you have accused your attorney of some kind of misconduct, at least not representing you to the best of his ability, that's caused him to file this Motion to Withdraw of Appearance.
>
> Gabriel Kowalskey: Right. . . . Your Honor, I don't want you to or Eric Oliver to be under the impression that, uh, I don't want him as a lawyer just like all of the rest of my lawyers, I just wanted to inform someone because I was trying to actually speak to you and tell you about some things before I left court that day.
>
> The Court: Um um (affirmative response).

Gabriel Kowalskey:  And it was going to be the same issues. . . .  I'm feeling that although I do believe that Eric Oliver is a – probably a fabulous lawyer, it's just I told him some things that he should have reacted in a certain way and . . . didn't and that gives me the, uh, understanding that he might not be doing exactly what I need to do for my case.  And I was just hoping that you could set things right; that's why I wrote you the letter and maybe influence or persuade, I don't know which one, my lawyer or even the prosecutor but more so my lawyer to – to work diligently or sincerely.  That's the only reason that I wrote you that letter.

The Court:  I don't have any control over your lawyer's, uh, relationship with you. . . .  Oliver has been in practice . . . [s]even years. . . .  Mr. Starkey has been a lawyer for ten years . . . .  Mr. Witham . . . has been in practice for twenty years and been a public defender right here in this court for probably fifteen years and you can't get along with any of those people. . . .  And I warned you last time you were here that we couldn't tolerate that anymore.

* * * * *

Gabriel Kowalskey:  . . .  I have no type of, you know, harsh feeling toward [] Oliver or actually any of the other, uh, lawyers that I had.  That is not what I'm to do and I don't want a different lawyer; I don't have time to have a different lawyer.  The reason why I'm so stressed and writing all these letters is because the fact that in a week . . . I will be having a suppression.  I'm – I'm fighting for my life. . . .

The Court:  . . .  [T]he bottom line is is due to your obstreperous conduct, the conduct that you keep demonstrating towards attorneys, uh, you know, this Court can find that you have waived by your conduct your right, uh, to have a lawyer. . . .

Eric Oliver:  [T]here's been nothing that's changed and the reason being is my concern is the effective assistance. . . .  He wants to have the best of both worlds and have the lawyer but dictate to the lawyer how they handle the case and that just doesn't make a feasible solution. . . .

Transcript at 25-30.  The court granted Oliver's motion to withdraw his appearance.  The court appointed appellate counsel for the purpose of this

interlocutory appeal and certified its orders in Cause No. 39 and Cause No. 142 that Kowalskey waived his right to the appointment of pauper counsel for interlocutory appeal.

## *Discussion*

[11] The issue is whether the trial court erred in finding that Kowalskey, by his conduct, waived or forfeited his right to counsel. He contends that he was not advised of any of the pitfalls of self-representation or advantages of being represented by an attorney, that there was no voluntary, knowing, and intelligent waiver of his right to counsel, that the record does not establish obstreperous conduct on his part, and that there was insufficient evidence of antagonistic conduct to conclude that he forfeited his right to counsel. Kowalskey argues that the court advised him, at the time it appointed Oliver, that if he did not get along with his new attorney the court would at that time advise him of the dangers and risks of self-representation, and that the court never gave him the required *Gilmore* warnings. He argues that the court took no affirmative step to ensure he appreciated the dangers and disadvantages of self-representation, that there was no analysis of whether he had made a knowing and intelligent waiver of his right to counsel, and that there was no on-the-record evidentiary hearing where specific findings were made as required by *Gilmore*. Kowalskey maintains that many of the waiver-by-conduct cases involve defendants whose conduct appeared to constitute determined efforts to manipulate and obstruct the trial process, that the record here shows his earnest struggle to push the process forward and not thwart the State's efforts to

prosecute him, and that his actions were aimed at obtaining the evidence needed to challenge the State's case.

[12] The State asserts that, while there is no dispute that Kowalskey did not affirmatively waive his right to counsel, the trial court properly found that he forfeited or waived his right to counsel through his conduct. It argues that the court held a hearing as required by *Gilmore* and sufficiently warned Kowalskey of the consequences of his conduct to allow the court to subsequently determine that he had forfeited his right to counsel. The State points to the court's statement at the January 6, 2015 hearing that it would "try one more time" and the court's warning that, if Kowalskey kept having problems with his attorneys, the court could decide that he had chosen to represent himself. The State argues that, although the court could have and perhaps ideally would have given a more expansive warning, the warnings given were sufficient to place Kowalskey on notice of the consequences of continuing to make it impossible for any attorney to represent him. The State also contends that the court sufficiently warned Kowalskey of the disadvantages of proceeding without counsel, that this was not a situation where a defendant was expressing a desire to represent himself because he felt he could do better than an attorney, and instead the record shows Kowalskey understood it was not in his best interest to proceed *pro se*.

[13] The right to be represented by counsel is protected by both the Federal and Indiana Constitutions. U.S. CONST. amend. VI; IND. CONST. art. 1, § 13. The right to counsel can be waived by a knowing, voluntary, and intelligent waiver.

*Gilmore*, 953 N.E.2d at 589 (citing *Jones v. State,* 783 N.E.2d 1132, 1138 (Ind. 2003)). Waiver of assistance of counsel may be established based upon the particular facts and circumstances surrounding the case, including the background, experience, and conduct of the accused. *Id.* (citing *Jackson v. State,* 441 N.E.2d 29, 32 (Ind. Ct. App. 1982)). "Of all the rights that an accused person has, the right to be represented by counsel is by far the most pervasive for it affects his ability to assert any other rights he may have." *Poynter v. State,* 749 N.E.2d 1122, 1125-1126 (Ind. 2001) (citation omitted).

[14]    In *Gilmore v. State*, this court addressed the waiver or forfeiture of a defendant's right to counsel due to the defendant's conduct. 953 N.E.2d at 589. Gilmore had five court-appointed attorneys, all of whom withdrew from representing him due to a breakdown of the attorney-client relationship. *Id.* at 585-586. The trial court found in part that Gilmore had waived his right to counsel by his obstreperous conduct. *Id.* at 585. On appeal, this court first set forth portions of the opinion of the United States Court of Appeals, Third Circuit, in *United States v. Goldberg*:

> A waiver is an intentional and voluntary relinquishment of a known right. The most commonly understood method of "waiving" a constitutional right is by an affirmative, verbal request. Typical of such waivers under the Sixth Amendment are the requests to proceed *pro se* and requests to plead guilty. . . . The High Court has emphasized the importance of an affirmative, on-the-record waiver, noting that it indulges every reasonable presumption against waiver of fundamental constitutional rights.
>
>                              * * * * *

At the other end of the spectrum is the concept of forfeiture. Unlike waiver, which requires a knowing and intentional relinquishment of a known right, forfeiture results in the loss of a right regardless of the defendant's knowledge thereof and irrespective of whether the defendant intended to relinquish the right. . . . In *United States v. McLeod*, 53 F.3d 322 (11th Cir. 1995), . . . the Eleventh Circuit concluded that a defendant who is abusive toward his attorney may forfeit his right to counsel.

\* \* \* \* \*

Finally, there is a hybrid situation ("waiver by conduct") that combines elements of waiver and forfeiture. Once a defendant has been warned that he will lose his attorney if he engages in dilatory tactics, any misconduct thereafter may be treated as an implied request to proceed *pro se* and thus, as a waiver of the right to counsel. . . . Thus, instead of "waiver by conduct," this situation more appropriately might be termed "forfeiture with knowledge."

\* \* \* \* \*

[F]orfeiture would appear to require extremely dilatory conduct. On the other hand, a "waiver by conduct" could be based on conduct less severe than that sufficient to warrant a forfeiture. This makes sense since a "waiver by conduct" requires that a defendant be warned about the consequences of his conduct, including the risks of proceeding *pro se*. . . . [A] true forfeiture can result regardless of whether the defendant has been advised of the risks of proceeding *pro se*. . . .

*Id.* at 589-590 (citing *United States v. Goldberg*, 67 F.3d 1092, 1099-1101 (3rd Cir. 1995)). The court in *Gilmore* then reviewed several opinions which examined the concepts of forfeiture and waiver by conduct, including the Indiana Supreme Court opinion in *Poynter v. State*, 749 N.E.2d 1122 (Ind. 2001).

[15] In *Poynter*, the defendant indicated that he would retain his own counsel, but after continuances were granted so that he could secure private counsel, a bench trial was held and neither the trial court nor the parties commented regarding

the absence of an attorney for the defendant. *Poynter*, 749 N.E.2d 1126. The trial court found the defendant guilty, and on appeal the defendant maintained that the court had a duty to advise him of the advantages of representation by counsel and the dangers of self-representation and that the lack of advisement negated any finding of a voluntary, knowing, and intelligent waiver of his right to the assistance of counsel. *Id.* at 1124-1125.

[16] In its opinion, the Indiana Supreme Court initially stated that, "[w]hen a defendant asserts the right to self-representation, the court should tell the defendant of the 'dangers and disadvantages of self-representation,'" *Poynter*, 749 N.E.2d at 1126 (citing *Faretta v. California*, 422 U.S. 806, 835, 95 S. Ct. 2525, 2541 (1975)), and that "[t]here are no prescribed 'talking points' the court is required to include in its advisement to the defendant; it need only come to a considered determination that the defendant is making a voluntary, knowing, and intelligent waiver." *Id.* (citing *Leonard v. State,* 579 N.E.2d 1294, 1296 (Ind. 1991)). The Court noted "[t]his determination must be made with the awareness that the law indulges every reasonable presumption against a waiver of this fundamental right." *Id.*

[17] The Court then observed that several courts have held that a verbal waiver of the right to counsel may not be necessary and that "so long as the . . . court has given a defendant sufficient opportunity to retain the assistance of . . . counsel, defendant's actions which have the effect of depriving himself of . . . counsel will establish a knowing and intentional choice." *Id.* (citing *United States v.*

*Hoskins,* 243 F.3d 407, 410 (7th Cir. 2001) (finding the defendant's conduct to be sufficient to imply waiver and that the trial court's inquiry was sufficient and provided explicit warning of consequences of continued conduct); *United States v. Irorere*, 228 F.3d 816, 828 (7th Cir. 2000) (holding that the defendant waived the right to counsel by his conduct where the court appointed four separate lawyers all of whom either requested to withdraw or were fired by the defendant and the defendant had been advised of the dangers and disadvantages of self-representation pursuant to *Faretta*)). The Court also observed that, "[i]n each of these waiver-by-conduct cases, . . . the courts recognized that, just like an express verbal waiver, an implied waiver is not valid absent a finding under the totality of the circumstances that the waiver is knowing and intelligent" and that "this finding invariably included evidence of an admonition to the defendant on the dangers and disadvantages of self-representation." *Id.* (citing *Hoskins*, 243 F.3d at 411; *Irorere*, 228 F.3d at 828).

[18] The Court in *Poynter* then noted that, in *United States v. Hoskins*, the Seventh Circuit Court of Appeals, in analyzing the defendant's waiver of his right to counsel, relied upon the following considerations: (1) the extent of the court's inquiry into the defendant's decision; (2) other evidence in the record that establishes whether the defendant understood the dangers and disadvantages of self-representation; (3) the background and experience of the defendant; and (4) the context of the defendant's decision to proceed *pro se*. *Id.* at 1127-1128 (citing *Hoskins*, 243 F.3d at 411). The Court found that, "[c]onsidering these factors within the circumstances of the present case we find that the trial court,

while it did determine that the defendant was advised of his trial rights and did tell the defendant of the procedural outcome if he failed to secure counsel, did not at any time advise the defendant on the dangers and disadvantages of self-representation" and that "[t]his lack of any advisement weighs heavily against finding a knowing and intelligent waiver." *Id.* at 1128. The Court also noted that, while there is evidence that the defendant chose to work and sleep rather than take the time to hire an attorney, his conduct did not result in gross delays or clearly appear to intend manipulation of the process. *Id.*

[19] In *Gilmore*, after reviewing *Poynter* and other cases, this court addressed whether Gilmore, by his conduct, had waived or forfeited his right to counsel and concluded:

> In the present case, Gilmore engaged in behavior that led his court-appointed attorneys to withdraw from representation. Understandably, the trial court became dissatisfied with the delay seemingly caused by Gilmore in moving the case forward. This conduct was not of the kind often associated with a finding of forfeiture of the right to counsel. Nor does this conduct fit neatly into the category of cases in which waiver of the right to counsel is found, as Gilmore repeatedly requested representation by counsel. Instead, it appears to be more along the lines of a waiver by conduct or forfeiture with knowledge. *As such, Gilmore was and is entitled to a hearing during which he should be warned that if his obstreperous behavior persists, the trial court will find that he has chosen self-representation by his own conduct. Then the inquiry turns to an analysis of whether Gilmore made a knowing and intelligent waiver of his right to counsel, which includes a warning of the dangers and disadvantages of self-representation established in an on-the-record evidentiary hearing where specific findings are made.* While not condoning Gilmore's apparent obstreperous conduct, because those warnings were not given to Gilmore, we conclude that the trial court erred by finding that Gilmore had waived his right to counsel. We, therefore,

vacate the trial court's order and remand for further proceedings consistent with this opinion.

*Gilmore*, 953 N.E.2d at 592-593 (emphasis added).

[20] In this case, Kowalskey specifically stated at the January 6, 2015 hearing that he needed a lawyer and at the February 9, 2015 hearing that his letter was sent to influence his lawyer to work diligently or sincerely, that he did not wish to have a different lawyer, that he did not "have time to have a different lawyer," and that he was stressed because the suppression hearing was scheduled for a week later. Transcript at 30. Thus, Kowalskey did not expressly and verbally waive his right to counsel, and we must determine whether a waiver by conduct or forfeiture with knowledge occurred.

[21] Oliver indicated that Kowalskey's February 5, 2015 letter prompted his request to withdraw appearance. In the letter, Kowalskey stated that he was scheduled for a suppression hearing, that the police had denied making an investigatory stop, that he knew the police had activated their emergency lights and thus that there had been an investigatory stop, that Oliver had not attempted to contact CVS for its surveillance system footage, that without footage he could not prove the arresting officer did not make a valid investigatory stop, and that he was not asking to fire Oliver but was hoping the court would demand the prosecutor to produce or obtain the officers' dash-cam footage or the CVS footage. At the February 9, 2015 hearing, Kowalskey stated that he did not want a different lawyer, that he did not have time to have a different lawyer, and that he was stressed and wrote the letter because his suppression hearing was scheduled for

a week later. The record does not establish that Kowalskey, in sending his letter to the court, engaged in obstreperous conduct or behavior. The court did not make specific findings supporting the conclusion that Kowalskey, by his letter or otherwise, engaged in obstreperous conduct.

[22] Moreover, similar to *Poynter*, while the trial court may have informed Kowalskey at the January 6, 2015 hearing that, if he kept having problems with lawyers, it could determine that he had decided to represent himself and that "*if we get to that point, . . . they'll have to inform you of . . . the dangers of self-representation and the risks* that are involved in it," the court did not at that time or later advise Kowalskey of the dangers and disadvantages of self-representation. Transcript at 10 (emphases added). The court's sole statement at the January 6, 2015 hearing that "[t]he short story is [Kowalskey] would be held to the same standard as this attorney sitting right here who's been to law school" was not an adequate advisement of the dangers and disadvantages of self-representation under the circumstances. *Id.* at 10. Like in *Poynter*, this lack of an adequate advisement of the dangers and disadvantages of self-representation "weighs heavily against finding a knowing and intelligent waiver." *See Poynter*, 749 N.E.2d at 1128.

[23] Additionally, the court did not enter specific findings, addressing the factors outlined in *Hoskins* and adopted in *Poynter* or otherwise, regarding whether it had given Kowalskey the required warnings regarding the dangers and disadvantages of self-representation, the extent to which Kowalskey's behavior related to his attorneys' requests to withdraw their appearances, his background

and experience, the context of Oliver's request to withdraw appearance and Kowalskey's January 5, 2015 letter regarding his approaching suppression hearing, or whether Kowalskey had made a knowing and intelligent waiver of his right to counsel under the circumstances as required by *Gilmore*. The trial court did not undertake an analysis of whether, or make specific findings supporting the conclusion that, Kowalskey demonstrated obstreperous conduct after being warned that such conduct could result in the waiver of his right to counsel or made a knowing and intelligent waiver of his right to counsel which included a warning of the dangers and disadvantages of self-representation.

[24] Based upon the record, *Gilmore*, and *Poynter*, and mindful that the law indulges every reasonable presumption against a waiver of the fundamental right to counsel, we conclude that the trial court erred in finding that Kowalskey, by his conduct, waived his right to pauper counsel. *See Poynter*, 749 N.E.2d at 1124-1128; *Gilmore*, 953 N.E.2d at 589-593. Accordingly, we reverse the order of the trial court and remand for further proceedings.

## *Conclusion*

[25] For the foregoing reasons, we reverse the orders of the trial court in Cause No. 39 and Cause No. 142 finding that Kowalskey by his conduct waived his right to counsel and remand for further proceedings consistent with this opinion.

[26] Reversed and remanded.

Crone, J., and Pyle, J., concur.